IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

KAREN JANE NELSON,

Plaintiff,

vs.

RYAN ZINKE, SECRETARY,
UNITED STATES DEPARTMENT
OF THE INTERIOR, and
LAWRENCE LOCKARD,

Defendants.

CV 16–135–M–DWM

OPINION
and ORDER

In October 2016, Plaintiff Karen Nelson ("Nelson") sued Defendant Ryan

Zinke, Secretary of the United States Department of the Interior ("the

Department"), and Lawrence Lockard ("Lockard") because she was sexually

assaulted on a work scuba diving trip in September 2015. Nelson seeks to hold the

Department liable for sexual discrimination and retaliation under Title VII, 42

U.S.C. §§ 2000e-2(a)(1), 2000e-3(a), and to hold Lockard liable for negligence.

(Doc. 1.) The Department moved for summary judgment, insisting that Nelson

cannot show liability under Title VII as a matter of law. (Doc. 20.)

Nelson's only chance of success on her Title VII discrimination claim is to

show that Lockard was her supervisor. Given the isolated nature of the incident,

Nelson cannot establish a hostile work environment. And, while Nelson raises a

genuine issue of material fact as to the authority held by Lockard, she fails to show

he could effectuate tangible employment action against her as a matter of law.

Consequently, Lockard is not her supervisor for the purposes of Title VII. Because

Nelson fails to show that the Department was negligent, summary judgment in the

Department's favor is appropriate. The Department is also entitled to judgment on

Nelson's Title VII retaliation claim.

**FACTUAL BACKGROUND**

The facts are largely undisputed, (*see* Fact Statements, Docs. 22, 33), but to

the extent disputes exist, the factual record is viewed in the light most favorable to

Nelson, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

**I.     The Montana Ecological Services Office**

The United States Fish and Wildlife Service ("the Service") is one of many

bureaus that make up the Department. (Doc. 33 at ¶ 1.) The Service itself is

divided into regions and offices. (*Id.*) Both Nelson and Lockard worked for the

Montana Ecological Services Office in Region 6. (*Id.*) The Montana Ecological

Services Office is involved in the oversight and evaluation of federally funded,

licensed, or permitted projects and provides expertise on environmental

contamination issues. (*Id.* at ¶ 2.) It has two offices in Montana, one in Helena

and a sub-office in Kalispell. (*Id.* at ¶ 4.)

Nelson works in the Helena office as a toxicologist, (*id.* at ¶ 6), and Lockard

2

worked in the Kalispell sub-office as a Fish and Wildlife Biologist, (*id.* at ¶ 10).
Nelson was directly supervised in her daily activities by Jodi Bush in Helena. (*Id.*
at ¶¶ 3, 5, 6.) Lockard was supervised by Ben Conard in Kalispell, with Bush as
his second-line supervisor. (*Id.* at ¶¶ 9, 10.) Nelson's husband, Brent Esmoil, also
works in the Helena office as a Deputy Field Supervisor. (*Id.* at ¶ 5.)

## II.    The Dive Team

Region 6 has a small dive team, consisting of eight volunteer members from
several states in Region 6. (*Id.* at ¶ 12.) Participation in the dive program is
voluntary and available to those who are qualified and express an interest in
conducting dive team missions. (*Id.*) Divers must be authorized by their line
supervisor to apply for participation and to take part in any particular dive or dive
training. (*Id.*) James D. Chandler is the Chief of the Division of Safety and
Occupational Health for Region 6 and has served as the Regional Dive Officer
since 2012. (*Id.* at ¶ 14.) Because Chandler is not a diver, Mitch Osborne, the
Region 7 Regional Dive Officer, assisted the Region 6 team by providing program
oversight as required by Service policy. (*Id.*) Diving operations are governed by
the Diving Safety Chapter of the Service Manual. (*See* Doc. 25-1.)

Both Nelson and Lockard were on the Region 6 dive team. (Doc. 33 at ¶¶
17, 19.) Lockard had served as the Region 6 Field Dive Officer since February
2015, (*id.* at ¶ 17), until he retired. Bush authorized Nelson's participation on the

3

dive team, (*id.* at ¶ 19), and since she joined the team, Nelson has conducted dives on approximately 50 workdays, (*id.* at ¶ 18). Certain benefits are extended to members of the dive team that are not offered to other Service employees. Given the physical requirements of diving, supervisors are expected to provide the necessary time, equipment, and training for divers to meet and maintain authorization standards, including up to three hours a week for aerobic exercise and strength building. (*Id.* at ¶ 13.) Nelson therefore received three hours of paid physical training per week. (Nelson Decl., Doc. 34 at ¶ 6.) Dive team members may also receive dive insurance or paid certifications, (*id.* at ¶¶ 7-8), and be eligible for hazard pay, (Doc. 33 at ¶ 12).

## III. The Incident

On September 11, 2015, Nelson reported a sexual assault to her supervisor, Jodi Bush. (*Id.* at ¶ 21.) At Bush's request, Nelson submitted a written statement and, on September 15, 2017, Bush emailed the statement to Special Agent in Charge for the Service Professional Responsibility Unit, Keith Toomey. (*Id.*; *see* Report, Doc. 26-2.) An undisputed summary of that statement is provided below:

> Between September 8 and 10, 2015, Fish & Wildlife employees Lawrence Lockard, of the . . . Kalispell suboffice, Karen Nelson, Toxicologist, and Chris Downs, Fishery Biologist, Glacier National Park, conducted a dive mission at Quartz Lake in Glacier National Park. . . . Quartz Lake is in a remote area of Glacier National Park, accessible by an approximately 6-mile hike from Bowman Lake. Nelson and Lockard slept in a small, one-room National Park Service cabin with two separate bunk beds. Downs slept outside because he did not wish

4

to disturb anyone's sleep due to his sleep apnea.

On the evening of Wednesday, September 9, 2016 [sic], the second
night at the site, Downs, Lockard, and Nelson ate dinner and drank a
glass of wine. Nelson then took a sleep aid and went to bed; Downs
again slept outside. Nelson recalls Lockard entering the cabin and
getting into his bunk. She recalled that [Lockard] told her he snored
and she had teased him by saying she had ear plugs and had taken a
sleeping pill.

At some point during the night, Nelson became aware that someone
was in bed with her, but she still was not awake enough to be aware of
what was happening. She stated she could feel that the person had lifted
her long underwear top, and was fondling her breasts and felt her long
underwear bottoms being moved down. She was groggy and
wondering where she was and reported that she originally thought that
her husband was with her. She started to become more fully awake and
knew that something wasn't right and stood up from her bunk. Lockard
quickly moved from her bunk and crawled back to his own.

The following day, September 10, 2015, Lockard and Nelson hiked out
of the area while Downs stayed behind to load their gear onto mules.
During the hike, Nelson reported that she and Lockard discussed what
happened the night before. Lockard told Nelson he had only realized
that she had been asleep once she got up from her bunk. After hiking
back to her vehicle, Nelson drove to a hotel in Kalispell, Montana,
where she stayed the night in a hotel before driving back to Helena on
Friday, September 11, 2015.

(Doc. 33 at ¶ 21 (internal citations omitted).) Nelson's report also included two

photographs, one of the cabin, (Doc. 26-2 at 4), and one of the bunks inside, (*id.* at

5). Based on Nelson's administrative complaint, some of the comments Lockard

made as they hiked out together included him describing sliding his hand up her

leg to "hit [her] where it counts" and his attempt to remove her long underwear to

5

"go down on [her]." (*See* Doc. 32-4 at 4.) He also claimed he thought she was receptive. (*Id.*)

Prior to Nelson's report, no employee had ever reported to Bush that they had observed or were the victim of any inappropriate behavior by Lockard. (Doc. 33 at ¶ 22.) Nelson had never reported any concerns regarding sexual harassment or inappropriate behavior by Lockard toward her or anyone else. (*Id.*)

## IV. The Department's Response

### A. Initial Response

On September 12, 2015, the day after Nelson reported the incident to Bush, Bush notified her supervisors, Nicole Alt and Michael Thabault. (*Id.* at ¶ 24.) Bush also contacted Human Resources and Kathy Dennis, the Assistant Regional Director for Budget and Administration. (*Id.*) Because Nelson and Lockard worked in separate offices that were located hours apart, according to policy it was determined that Lockard need not be placed on administrative leave. (*Id.*)

The next day, Sunday, September 13, Bush contacted Michelle Rockwell, Regional Human Resources Officer for Region 6. (*Id.* at ¶ 25.) Bush informed Rockwell of the allegation and Rockwell concurred that administrative leave was not appropriate due to the substantial physical distance between the two employees. (*Id.*) Bush and Rockwell discussed informing Lockard that he was to have no contact with Nelson. (*Id.*) Bush was told that Carla Goltz was the

6

Employee Relations Specialist handling the matter. (*Id.*) Bush also spoke to Ben Conard, Lockard's direct supervisor in Kalispell. (*Id.* at ¶ 29.) Bush informed Conard of the incident and that Lockard was to have no contact with Nelson. (*Id.*)

On Monday, September 14, Conard and Bush informed Lockard that he had been accused of sexual misconduct and that he was to have no contact with Nelson or her husband, was not to travel to the Helena office, and was to remove himself from any dive events in which Nelson—or any other female—would be involved. (*Id.* at ¶ 30.) Later that week, Bush prepared a memo, approved by Goltz, reiterating the oral notice given to Lockard. (*Id.* at ¶ 31.) The memo clarified that Lockard was to have no email, phone, or personal contact with Nelson or her husband. (*Id.*) The memo was provided to Conard and delivered to Lockard. (*Id.*) The memo also removed Esmoil from Lockard's chain of command. (*Id.* at ¶ 32.)

## B. Investigation

On September 14, Keith Toomey, Special Agent in Charge for the Service's Professional Responsibility Unit, received a call from Les Seago, Assistant Special Agent in Charge, National Park Service, reporting that his office was investigating criminal allegations regarding the alleged sexual assault. (*Id.* at ¶ 33.) The Professional Responsibility Unit was notified based on the serious allegations of misconduct; however, because the incident occurred in the national park and the National Park Service had an agent in the vicinity, the National Park Service took

7

the lead in the investigation. *(Id.)* On September 15, Toomey informed Bush that jurisdiction for the investigation of the incident was a joint effort of the National Park Service and Fish and Wildlife Service, that a criminal investigation was being conducted, and that Human Resources would not conduct interviews until the United States' Attorney made a decision about bringing a criminal complaint. *(Id.* at ¶ 35.) Toomey also informed Goltz that the civil investigation would need to wait until after the criminal case. *(Id.* at ¶ 36.)

On September 21, Human Resources learned that Lockard had put in his paperwork to retire with a planned retirement date of October 31, 2015. *(Id.* at ¶ 37.) Lockard's last day in the office was October 29. *(Id.)* Although the parties dispute when the Department became aware the criminal investigation was concluded, *(see id.* at ¶ 39), on October 16, Nelson requested via email that expedited employment action be taken against Lockard, *(id.* at ¶ 41). Ultimately, the Professional Responsibility Unit decided not to pursue an administrative investigation until the criminal case was complete, *(id.* at ¶¶ 34-35), and due to Lockard's retirement, no administrative discipline ever occurred.

## C.    Email Contact

Prior to his retirement, Lockard's contact with Nelson was limited to two group emails. On September 29, Lockard announced his impending retirement in an email to 12 recipients, including Nelson. *(Id.* at ¶ 44.) On October 1, Conard

8

verbally informed Lockard that he was not to have any contact with Nelson, including email. (*Id.*) On October 29, Lockard sent another group email to seven recipients, including Nelson, providing a scientific factual debrief of the September 8-10 dive mission. (*Id.* at ¶ 45.) Lockard retired within hours of sending that email, preventing Conard from discussing it with him. (*Id.*)

## D.   Criminal Case

On November 20, 2015, Lockard was indicted for attempted sexual abuse in violation of 18 U.S.C. § 2242(2) (Count I) and abusive sexual contact in violation of 18 U.S.C. § 2244(b) (Count II). (*United States v. Lockard*, CR 15-37-M-DLC, Doc. 1.) Lockard appeared in United States District Court on December 8, 2015, pled not guilty, and was released on conditions. (*Id.* at Doc. 5) On February 5, 2016, Lockard pled guilty to a Superseding Information charging abusive sexual contact in violation of 18 U.S.C. § 2244(b). (*Id.* at Doc. 14.) In his plea agreement, he admitted that he knowingly had sexual contact with Nelson without her permission. (*Id.* at Doc. 20, p. 3.) On May 20, 2016, Lockard was sentenced to six months custody with five years of supervision to follow and ordered to pay restitution in the amount of $ 21,872.49. (*Id.* at Doc. 31, 36.) He was also required to register as a sex offender. (*Id.* at Doc. 31, p. 3.)

## E.   Co-Worker and Supervisor Conduct

Near the end of November 2015, Conard was made aware of a pending

9

newspaper report about Lockard's indictment. (Doc. 33 at ¶ 47.) Conard informed his supervisees in the Kalispell sub-office of a possible news article. (*Id.*) Nelson argues that Conard did so at the behest of Lockard, as the two were friends. (*Id.*) The Department insists that Conard was told by someone other than Lockard and notified the office "in order to control the office environment, so that staff would not be taken by surprise." (*Id.*) Following Lockard's arraignment, Agent Toomey also contacted Bush to inform of possible press coverage. (*Id.* at ¶ 48.)

After the commencement of the criminal proceeding became public, Nelson reported to Bush in January 2016 that the office's administrative officer, Sharon Hooley, was treating her coldly and no longer speaking to her. (*Id.* at ¶ 49.) Nelson felt that this was due to the action taken against Lockard. (*Id.*) Bush spoke with Hooley around January 29, 2016, explaining that the office was a working environment and that Hooley needed to work with Nelson regardless of her personal feelings. (*Id.*) Bush notified Hooley that if she could not control her behavior, Bush would need to bring in some assistance. (*Id.*) Hooley returned to work and confirmed with Bush that she would work with Nelson and knew what was expected of her. (*Id.*)

A month later, Nelson reported another problem with Hooley. (*Id.* at ¶ 50.) In February 2016, Hooley sent an email to staff notifying them of an upcoming self-defense class. (*Id.*) Nelson reported that during a birthday celebration, the

self-defense class came up and Nelson stated that she was not ready for one. (*Id.*) Nelson stated that Hooley looked directly at her and asked why she was not ready yet. (*Id.*) Nelson felt that this was a reference to the sexual assault. (*Id.*) Bush was not at the event, but met with Hooley on February 24 to discuss it. (*Id.*) Hooley denied any ulterior motive in making the comment and said she was referring to scheduling. (*Id.*) Bush warned Hooley to be sensitive about her language and to be professional. (*Id.*)

In June 2016, Nelson reported to Bush that she heard third-party reports that Wade Fredenberg, an employee in the Kalispell sub-office, told people at an American Fisheries Society meeting in February that there was a different version of events. (*Id.* at ¶ 51.) Bush contacted Conard and he agreed to give Fredenberg an oral warning. (*Id.*) Fredenberg also received a written warning that provided further discussion of the topic in a work context could lead to disciplinary action. (*Id.*; *see* Doc. 24-6 (July 12, 2016 written warning).) Conard also reminded all employees in the Kalispell sub-office that there was to be no discussion of the issue. (Doc. 33 at ¶ 51.) Nelson requested the names of the people Fredenberg spoke to; none were provided. (*Id.*)

## ANALYSIS

### I.    Hostile Work Environment

Under Title VII, an employer may not "discriminate against any individual

11

with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Sexual harassment is a form of sex discrimination. By tolerating sexual harassment against its employees, the employer is deemed to have adversely changed the terms of their employment in violation of Title VII." *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001). A plaintiff claiming a "hostile work environment" "must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). "An employer may [then] be held liable for creating a hostile work environment either vicariously (i.e., through the acts of a supervisor) or through negligence (i.e., failing to correct or prevent discriminatory conduct by an employee)." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 688 (9th Cir. 2017); *Swenson*, 271 F.3d at 1191-92 ("Title VII liability is direct, not derivative: An employer is responsible for its own actions or omissions, not for [a] co-worker's harassing conduct.").

## A.   Severe or Pervasive Discrimination

To prevail on her claim, Nelson must show that her "workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)

(internal quotation marks and alterations omitted). "The working environment must both subjectively and objectively be perceived as abusive." *Id.* (quoting *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995)). Relevant factors in this inquiry include the "frequency, severity and level of interference with work performance," *id.* at 924, based on the totality of the circumstances, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Three events are relevant to Nelson's claim that a hostile work environment existed: (1) the incident at Quartz Lake, (2) the conversation between Lockard and Nelson on the hike out the next day, and (3) the two group emails Lockard sent after the fact. Nelson claims these incidents pervaded her work environment to a significant degree:

> I have post-traumatic stress disorder, and work has become a daily trigger of the assault. I have been going to regular counseling sessions because of the assault. I have nightmares and can no longer sleep without medication. I suffer other physiological symptoms such as acid reflux on really bad days as well. I constantly worry that Lockard will try to hurt me, my husband or my dogs because of the impacts to Lockard from the criminal process.

(Nelson EEO Aff., Doc. 32-4 at 7.) Nelson has alleged sufficient facts to support the subjective portion of her hostile work environment claim. The question remains whether her apprehension was objectively reasonable.

As explained in *Brooks*, Nelson's primary hurdle in establishing her claim is that Lockard's conduct was primarily an isolated incident. "Because only the

13

employer can change the terms and conditions of employment, an isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship." *Brooks*, 229 F.3d at 924. In *Brooks*, the Ninth Circuit encountered conduct similar to what occurred here: a co-worker touched the plaintiff "inappropriately on her stomach and breast," over the course of a few minutes and as part of a single episode. *Id.* The court held that single incident was insufficient to objectively conclude that "the terms and conditions" of the plaintiff's employment were altered. *Id.* at 925.

Nelson relies heavily on an unpublished decision out of the District of Puerto Rico to emphasize that Title VII does not have a "strict durational requirement" for abuse. *See Hernandez-Mendez v. Rivera*, 2017 WL 3278852, at *16 (D.P.R. Aug. 1, 2017). While that is true, *Rivera* itself involved conduct occurring over a one month period. And, more importantly, Title VII requires the alleged abuse be "sufficiently severe or pervasive to alter the conditions of her employment." *Brooks*, 229 F.3d at 923. Despite the egregious nature of Lockard's conduct and his alleged comments the next day, they do not meet this threshold. Nor do the two group emails Nelson received from Lockard establish a hostile work environment, *(see* Doc. 33 at ¶¶ 44, 45), as she fails to show those emails or their content went beyond "routine" contact, *Fuller*, 47 F.3d at 1528. Because no

14

reasonable woman in Nelson's position would believe that Lockard's misconduct

had permanently altered the terms or conditions of her employment,[1] Nelson fails

to establish a hostile work environment as a matter of law.

## B.    Employer Liability

Even if Nelson could establish a hostile work environment, she fails to show

that the Department is liable.  The Department's liability for workplace harassment

under Title VII depends on the status of the harasser.  *Vance*, 133 S. Ct. at 2439,

2443.  If the harasser is the victim's co-worker, "the employer is liable only if it

was negligent in controlling working conditions."  *Id.* at 2439.  If the harasser is a

"supervisor," however,

> different rules apply.  If the supervisor's harassment culminates in
> tangible employment action, the employer is strictly liable.  But if
> no tangible employment action is taken, the employer may escape
> liability by establishing, as an affirmative defense, that (1) the
> employer exercised reasonable care to prevent and correct any
> harassing behavior and (2) that the plaintiff unreasonably failed to
> take advantage of the preventive or corrective opportunities that the
> employer provided.

*Id.*  "For these reasons, whether the harasser was a 'supervisor' within the meaning

---

[1] *Brooks* does distinguish between co-workers and supervisors, and if
Lockard qualified as her supervisor, this isolated incident of physical assault may
be sufficient to create a hostile work environment.  *See* 229 F.3d at 927 n.9 ("[A]
sexual assault by a supervisor, even on a single occasion, may well be sufficiently
severe so as to alter the conditions of employment and give rise to a hostile work
environment claim.").  However, as discussed below, Lockard was not Nelson's
supervisor for the purposes of Title VII.

of Title VII is a critical threshold question in determining whether the employer can be held vicariously liable for the harassment." *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 737 (10th Cir. 2014). The plaintiff bears the burden of showing that the harasser qualifies as a supervisor under Title VII. *Pullen v. Caddo Parish Sch. Bd.*, 830 F.3d 205, 214 (5th Cir. 2016).

Here, the Department argues that because Lockard was not Nelson's supervisor, Nelson's only chance of recovery is to show the Department was negligent in "controlling working conditions." *Vance*, 133 S. Ct. at 2439. Nelson insists, on the other hand, that the Department is vicariously liable because Lockard's role as Field Dive Officer was sufficient to establish his supervisory position. The Department has the better argument under *Vance*.

## 1. Vicarious Liability

In instances where the harasser is a supervisor, "an employer may be *vicariously* liable for its employees' creation of a hostile work environment." *Vance*, 133 S. Ct. at 2441. "[A]n employee is a 'supervisor' for the purposes of . . . Title VII if he or she is empowered by the employer to take tangible employment actions against the victim . . . ." *Id.* at 2439, 2454. To take "tangible employment actions" means "to effect 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 2443 (quoting

16

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). It is not enough that a co-worker has the authority to direct the victim's work, "something more is required in order to warrant vicarious liability." *Id.* at 2444.

*Vance*, the Supreme Court's recent attempt to clarify supervisory status under Title VII, envisions questions of supervisory status will generally be resolved at summary judgment or earlier. 133 S. Ct. at 2443, 2449, 2450; *see Equal Empl. Opp. Comm'n v. AutoZone, Inc.*, 692 Fed. App'x 280, 284 (6th Cir. 2017) ("*Vance* establishes a 'sharp line between co-workers and supervisors,' not an invitation for speculation about amorphous levels of influence."). Such resolution is appropriate here.

It is undisputed that Lockard did not have the authority to hire, fire, promote or reassign Nelson. The parties worked in different offices and, while they were both supervised by Bush, did not fall within each other's supervisory hierarchy. (*See* Org. Chart, Doc. 23-1; Docs. 23-2, 23-3 (outlining job duties).) Nevertheless, Nelson insists Lockard was her supervisor in his capacity as Field Dive Officer.

Nelson first argues that Lockard is her supervisor because he directed dive team work. To the contrary, the Supreme Court has held that "the ability to exercise significant direction over another's daily work" is not sufficient to create supervisory status. *Vance*, 133 S. Ct. at 2443, 2452 ("Members of a team may each have the responsibility for taking the lead with respect to a particular aspect

of the work and thus may have the responsibility to direct each other in that area of responsibility."). The fact that Lockard was in charge of the dive team's daily operation and activities is insufficient to make him Nelson's supervisor. *See Reynaga*, 847 F.3d at 689 (holding that harasser's status as "lead millwright" and "authority to direct the work of other millwrights and tell them which tasks to perform [each] day" insufficient to establish supervisory status).[2]

Nelson further argues that Lockard could remove her or other dive team members from the team either "officially, by recommendation, [or] unofficially by not inviting her to dive." (Doc. 32 at 19.) In response, the Department argues that Lockard was not empowered to make such a decision and that, even if he was, removal from the dive team would not constitute a significant change in Nelson's employment status as a matter of law. Because the Department is correct as to its second point, Nelson's argument fails as a matter of law.

As to the Department's first point, only Regional Dive Officers and Project Leaders have the official authority to suspend a diver's authorization. (Doc. 25-1, at 13, Manual § 10.13(E).) Therefore Bush, as Nelson's direct supervisor, and Chandler, as the Regional Diver Officer, had the authority to regulate Nelson's dives. According to the Service's Diving Safety Guidebook, "[t]he need for the

---

[2] During oral argument plaintiff's counsel proffered a mill foreman as the archetypal example of a "supervisor." However, that example is at direct odds with *Reynaga*.

18

applicant's diving skills is a line management decision. Applicants must submit a request for diver authorization through their Project Leader to the [Regional Dive Officer]." (Doc. 25-1 at 11, § 10.12(A).) And, only Project Leaders and Regional Dive Officers have the ability to deny authorization or suspend a diver. (*See id.* at 12, § 10.12(B)-(E).) By contrast, Lockard's official duties as Field Dive Officer were limited, and included evaluating and monitoring diving operations as to "bring[] any deficiencies or potential problems to the attention of the [Regional Dive Officer] and appropriate line management." (*Id.* at Table 10.2(H).) Based on the relevant employment documentation, the Department did not directly "empower" Lockard to remove anyone from dive team, including Nelson. *Vance*, 133 S. Ct. at 2439.

Nelson presents evidence, however, that in reality, Lockard was delegated such authority. *Vance* recognizes that "at some point the ability to provide advice and feedback may rise to the level of delegated authority sufficient to make someone a supervisor." *Velasquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 272 (1st Cir. 2014) (citing *Vance*, 133 S. Ct. at 2452). "A manager who works closely with his or her subordinates and who has the power to *recommend* or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII." *Kramer*, 743 F.3d at 737. Moreover, "when the individuals vested with

19

actual decisionmaking power do not interact regularly with the employee, they will have limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Id.* (internal quotation marks omitted).

The record shows at least one circumstance where an individual wanted to be on the dive team but did not make the team because Lockard decided not to submit the individual's name to Chandler. (Doc. 37-1 at 2.) But, as argued by the Department, this fact alone is not sufficient to establish his authority over Nelson, as he was not involved in her hiring process. *See Ward v. Shaddock,* 2016 U.S. Dist. Lexis 106438, at *34 (S.D.N.Y. Aug. 11, 2016) (distinguishing authority over new hires from authority over existing employees). Nevertheless, the record reflects that Chandler lacked dive experience, making him more reliant on outside help in making dive team decisions. *(See* Doc. 33 at ¶ 14). Chandler was also not involved in any of the actual dive operations. *(See* Nelson Decl., Doc. 34 at ¶ 24 ("In all the years I have been a member of the dive team, neither Chandler nor Osborne ever provided any input to me with regard to a Region 6 dive. I received all of my direction from Lockard.").) And, other than Lockard, no other person was present on dive missions who served as Nelson's supervisor. *See Moody v. Atl. City Bd. of Edu.,* 870 F.3d 206, 217 (3d Cir. 2017) (highlighting a lack of alternative on-site supervisor as relevant to supervisory determination); *see also*

*Rivera*, at \*21-22 (applying *Vance*'s "delegated authority exception" to find on-site manager qualified as supervisor despite organization's rigid hierarchal structure). Chandler admits that he would consider Lockard's input as it relates to decisions affecting dive operations. (*See* Chandler Aff., Doc. 25 at ¶ 8); *see Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (explaining that a harasser may be capable of taking tangible employment where higher management acts as a "rubber stamp" for a harasser's decisions).

In his affidavit, Lockard states that he "was responsible for selecting which dive team members would participate in a dive mission and what their assignments would be on each respective dive," and that he "had the authority to choose or not choose any divers for any diving activities, thereby effectively removing any divers from the dive team, including Nelson." (Doc. 35, at ¶¶ 6, 7.) Although Lockard lacked the direct authority to prevent Nelson from diving, she presents sufficient evidence to create a factual issue as to whether Lockard was delegated sufficient authority in his role as Field Dive Officer to "bring[] the official power of the enterprise to bear on subordinates." *Burlington Indus., Inc.*, 524 U.S. at 762.

The Department further argues, however, that even if Lockard had the authority to affect Nelson's ability to dive, indirectly removing Nelson from dive operations was not in itself a "tangible employment action" because her voluntary participation on dive team was not part of her job as a toxicologist. Nelson, on the

21

other hand, emphasizes the subjective importance of the benefits related to diving, including paid physical training, dive insurance, and certifications. (Doc. 34 at ¶¶ 6-8.) Although both parties' arguments have infirmities, the ability to remove Nelson from dive assignments does not amount to "tangible employment action."

Preliminarily, Nelson's identification of the benefits at issue cuts too broadly. With the exception of diving itself, these benefits—paid weekly physical training, dive insurance, and certifications—are all provided by line management, Project Leaders, or Facility Managers. The Diving Safety Manual specifically tasks these individuals with ensuring that "divers [are given] the necessary time, equipment, and training to meet and maintain authorization standards, including up to 3 hours per week for aerobic exercise and strength building." (Doc. 25-1 at 5, Table 10.2(I)(3).) They are also tasked with "[p]rovid[ing] funding for physical examinations, first aid and cardiopulmonary resuscitation (CPR) training, equipment, oxygen administration, and any additional standard diver training [the Department] may require for a diver to maintain diving authorization." (*Id.* at Table 10.2(I)(4).) "Line management supervisors are responsible for authorizing the time, resources, and hazard duty payment necessary for divers to meet minimum proficiency standards." (*Id.* at 13, § 10.13(C).) Therefore, even assuming Lockard could indirectly prevent Nelson from diving, he had no authority, indirect or otherwise, over her other dive-related benefits. The only

"benefit" Lockard could therefore affect is the activity of diving itself.

When the Supreme Court first espoused what a "tangible employment action" entails in *Burlington Industries, Inc.*, it also explained what it does not include, such as a "bruised ego," demotion without change in pay, benefits, duties or prestige, or reassignment to a more inconvenient job. 524 U.S. at 761 (collecting cases). Rather, a "tangible employment action" generally "inflicts direct economic harm." *Id.* at 762. As argued by the Department, Nelson volunteered for dive team and it was not part of her duties as a toxicologist. And, while she would dive during working hours, she would get paid for those hours for her regular work. Therefore even if Lockard could effectively prevent her from diving, he could not prevent her from working and she cannot identify a resulting direct economic harm. Viewing the record in the light most favorable to Nelson, Lockard's unofficial authority was not such that he could influence tangible employment action against her. In the absence of the ability to take tangible employment action against Nelson, Lockard does not qualify as her supervisor under Title VII.

## 2. Negligence

Because Lockard was not Nelson's supervisor but only a co-worker, Nelson faces a greater burden in establishing the Department's liability: the Department is liable only if it "knew or reasonably should have known about the harassment but

23

failed to take remedial action." *Vance*, 133 S. Ct. at 2441. Because Nelson's claim is based on an isolated incident of which the Department only became aware after the fact, Nelson "must show that she reasonably feared that she would be subject to such misconduct in the future because the [Department] encouraged or tolerated [Lockard]'s harassment." *Brooks*, 229 F.3d at 924. "Notice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment." *Swenson*, 271 F.3d at 1192 (internal quotation marks omitted). "This obligation has two parts. The first consists of the temporary steps an employer takes to deal with the situation while it determines whether the complaint is justified. The second consists of the permanent remedial steps the employer takes once it has completed its investigation." *Id.*

## a. Limiting Contact

The first consideration is the Department's immediate response to Nelson's complaint, including limiting the contact between Lockard and Nelson. *Id.* "The degree of separation imposed, if any, must be a function of the severity of the alleged harassment and the evidence provided to the employer in support of the complaint." *Id.* "The more egregious the conduct alleged, and the more substantial the proof supporting the allegation, the harder the employer must try to minimize further contact between the two employees pending the outcome of the

24

investigation." *Id.* at 1192-93. However, the Department was not required to provide Nelson "a [Lockard]-free workplace." *Id.* at 1192.

Nelson first reported the incident to Bush on Friday, September 11, 2015. (Doc. 33 at ¶ 21.) By Monday, September 14, upper-level management was made aware of the incident and Lockard was directed not to have any contact with Nelson. (*Id.* at ¶ 30.) Later that same week, Bush prepared a memo reiterating the oral notice given to Lockard. (*Id.* at ¶ 31.) The memo clarified that Lockard was to have no email, phone, or personal contact with Nelson or her husband. (*Id.*)

Nelson challenges two aspects of the Department's initial reaction: first, its decision not to place Lockard on administrative leave, and second, its failure to prevent Lockard from emailing her on two occasions. Neither challenge has merit.

The Department shows that its decision not to place Lockard on administrative leave was consistent with its internal policy and reasonable under the circumstances. The Department's Absence and Leave Handbook defines "administrative leave" as "[a]n excused absence from duty without charge to leave or loss of pay." (Doc. 27-1 at 4, § 1-4(A).) It further describes administrative leave "as the situation when an employee is temporarily relieved of his or her normal responsibilities by their supervisor, continues to receive regular pay and benefits, and is normally required to remain away from the work-site during regular work hours." (Doc. 33 at ¶ 26.) Contrary to Nelson's implication that

administrative leave should have served a punitive function, administrative leave does not constitute an adverse action and "should only be done in the most exceptional circumstances (i.e., cases involving proposed removals or indefinite suspensions), when all other options are considered imprudent." (*Id.* (internal quotation marks and citation omitted).)

The Handbook further explains that administrative leave "should only be considered in rare instances . . . when immediate action must be taken to remove an employee from his or her work site because of a disruption; threat to the health and/or safety of an employee[ or] person or property entrusted to that employee and no other viable options are available." (*Id.* at ¶ 27 (citing Handbook, § 12-2).) The Handbook recognizes that "modification of duties, a temporary reassignment to another position or another work area or a reassignment to another work shift may suffice" to remedy the health or safety concern. (*Id.*) Because Lockard and Nelson did not work in the same office or have common job duties, Lockard's remaining in the Kalispell sub-office did not disrupt Nelson's work activity or threaten her health or safety, and was in itself a viable alternative to placing him on leave. *See Swenson*, 271 F.3d at 1192 (concluding the United States Postal Service acted reasonably in moving an alleged harassing co-worker to a different location within the same facility). Accordingly, the Department's decision to not place Lockard on administrative leave was reasonable.

26

The next question is whether the Department took reasonable action to

prevent Lockard from contacting Nelson. Immediately following the incident,

Lockard was told not to contact Nelson, including via email. (Doc. 33 at ¶ 30.)

But, prior to his retirement, Lockard included Nelson on two group emails. On

September 29, Lockard announced his impending retirement in an email to 12

recipients, including Nelson. (*Id.* at ¶ 44.) That email stated:

> Dive Team 6,
> I have decided to retire at the end of October (in order to be freed up
> for the remainder of the hunting season). The decision came quickly
> as I realized my main interest for continuing work for the Service was
> primarily related to dive team activities and that future dive activities
> would not be able to accomplish another goal in a timely manner (my
> goal was to develop an alternative lake trout suppression
> methodology; "selective spearfishing suppression"; we need a better
> lake to conduct experiments in!). It has been a real pleasure working
> and diving with all of you; thanks for your support over the years.
> Larry.

(Doc. 23-8 at 1.) On October 1, Conard responded, verbally admonishing Lockard

he was not to have any contact with Nelson, including email. (Doc. 33 at ¶ 44.)

On October 29, Lockard sent another group email to seven recipients,

including Nelson, providing a scientific factual debrief of the September 8-10 dive

mission. (Doc. 23-9.) That email is approximately 3 paragraphs in length and

outlines the nature and purpose of the September dives, makes recommendations

based on dive observations, and identifies relevant photographs. (*Id.*) The specific

references to Nelson are limited, but include: "If you have any questions about the

27

photos or observations made, please contact Karen Nelson . . . ; Karen has observed, and identified on her own, suitable lake trout spawning habitat in Quartz, McDonald, Holland, and Lindbergh lakes; Karen is also a trained and experienced spearfisher." (*Id.*) Lockard retired within hours of sending the email, preventing Conard from discussing it with him or reprimanding him. (Doc. 33 at ¶ 45.)

The Department was not required provide Nelson "a [Lockard]-free workplace." *Swenson*, 271 F.3d at 1192. Although the Department made clear to Lockard that he was not to contact Nelson, he asserts he included her in "routine" dive team emails. (*See* Lockard, EEO Aff., Doc. 32-1 at 8); *Fuller*, 47 F.3d at 1528. While Nelson disagrees with Lockard's actions, the Department has shown its response was reasonable and did not condone the contact. The Department took prompt corrective action that was "reasonably calculated to end the harassment." *Swenson*, 271 F.3d at 1192.

### b. Criminal Investigation

"The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Id.* at 1193. "An investigation is a key step in the employer's response, and can itself be a powerful factor in deterring future harassment." *Id.* Here, the question is whether it was reasonable for the Department to stay its administrative investigation and disciplinary process in light

28

of an ongoing federal criminal investigation. Complicating matters further, Lockard retired before federal charges were filed, effectively preventing subsequent administrative action.

Nelson categorizes the Department's response—i.e., the decision to stay its administrative process—as inaction. *See Fuller*, 47 F.3d at 1529 ("[I]naction [cannot] fairly be said to qualify as a remedy 'reasonably calculated to end the harassment.'"). Nelson notes that the only action the Department took was to open a file with the Professional Responsibility Unit, comprising a one-page brief describing the incident. (*See* Memo. of Investigation (Sept. 14, 2015), Doc. 26-1.) Nelson credits the investigation to the National Park Service. (Doc. 32 at 28.)

The investigation in this case was handled jointly by the National Park Service and the Fish and Wildlife Service's Professional Responsibility Unit, with the National Park Service taking lead. (Doc. 33 at ¶ 33.) The matter was almost immediately removed from any administrative action by Agent Toomey of the Professional Responsibility Unit. (*Id.* at ¶ 35.) Although the Professional Responsibility Unit "is a criminal investigative unit whose primary function is to investigate allegations of misconduct by Service law enforcement officers," it also "conducts both criminal and administrative investigations for the Service of other non-law enforcement Service employees when asked based on the seriousness of the alleged offense." (Doc. 26-8.) The Tuesday after the incident, Agent Toomey

told Bush that Human Resources would not conduct interviews until the United States' Attorney made a decision about bringing a criminal complaint. (*Id.* at ¶ 35.) Agent Toomey also told Goltz that the civil investigation of Lockard would need to wait until after the criminal case. (*Id.* at ¶ 36.) Ultimately, the Professional Responsibility Unit decided not to pursue an administrative investigation until the criminal case was complete. (*Id.* at ¶¶ 34-35.) Lockard was indicted on November 20, 2015, and sentenced on May 20, 2016. (*See United States v. Lockard*, CR 15-37-M-DLC.)

Complicating Nelson's argument, on September 21, 2015, Human Resources learned that Lockard had put in his paperwork to retire with a planned retirement date of October 31. (*Id.* at ¶ 37.) Lockard's last day in the office was October 29. (*Id.*) The Department insists that Lockard's swift retirement effectively prevented administrative action. Nelson insists that even with Lockard's anticipated retirement date, the Department had more than two weeks to take disciplinary action if it pursued her expedited notice request.[3] (Doc. 32 at 29.) But, pursuant to the Service's Disciplinary Manual, even before it issues a notice, "management

---

[3]  The Disciplinary Manual provides for a shortened notice period of seven days "when there is reasonable cause to believe an employee has committed a crime (either on or off the job) for which a sentence of imprisonment may be imposed." (Doc. 27-1 at 12, § 1.7(C)(1)(b)); 5 U.S.C. § 7513 (cause and procedure statute); 5 C.F.R. § 752.404 (procedures).

should conduct a thorough inquiry into any apparent offense (collecting information to the greatest extent practicable directly from the subject employee) to ensure the objective consideration of all relevant facts and aspects of the situation. Ordinarily, this inquiry will be conducted by the appropriate line supervisor, with guidance" from human resources. (Doc. 27-1 at 8-9, § 1.7.) But the Manual further provides that situations "involving possible criminal activity[] warrant an investigation" by internal law enforcement. (*Id.* at 9.)

Nelson further argues, however, that the Department had the criminal investigation results as of mid-October, 2015. (Doc. 32-4 at 13.) But, even with an expedited 7-day notice period, Lockard would still have had 14 days to respond. (Doc. 27-1 at 12, § 1.7(C)(2).) Lockard would also have a right to review, which would have required turning over criminal discovery prior to his indictment. *See United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1025 (D. Or. 2014) (discussing the dilemma created by a government employer compelling an employee's incriminating speech).

The record does not support Nelson's characterization of the Department's response as "no action." Her attempt to distinguish the Department's response and the Park Service's criminal investigation is unpersuasive because the National Park Service is a bureau within the Department. (Doc. 36 at 14 (outlining executive agency authority).) Moreover, the decision to pursue a criminal investigation was

consistent with the Department's Disciplinary Manual, which provides that "certain situations (particularly those involving possible criminal activity) warrant an investigation by . . . internal Bureau law enforcement/criminal investigation offices." (Doc. 27-1 at 9.) The Department maintains that it appropriately "prioritized the most severe sanction: criminal prosecution." (Doc. 36 at 13.) Given the criminal investigation and prosecution that occurred, the Department's investigatory response was reasonable.

### c. Permanent Steps

"Lockard retired without incident and the Department gave him an award and excellent employment evaluation." (Doc. 32 at 29 (citing Lockard Decl. Doc. 35 at ¶ 12).) Lockard retired with "a superior overall rating for his 2015 performance," and received an "Exceptional" rating for leadership as a field dive officer. (*See* Doc. 32-2 at 3.) Nelson "did not want [Lockard] to retire with a clean record." (Doc. 32-4 at 13.) Nelson's criticism of the Department in this regard is probably her strongest argument. But, while Nelson is due her metaphorical pound of flesh, she seeks blood,[4] which goes beyond the purview of

---

[4] This bond doth give thee here no jot of blood.
The words expressly are 'pound of flesh.'
Take then thy bond, take thou thy pound of flesh,
But in the cutting it if thou dost shed
One drop of Christian blood, thy lands and goods
Are by the laws of Venice confiscate
Unto the state of Venice.

Title VII.

The Department is correct that an employer can "properly take into account" an alleged harasser's grievance rights in determining whether discipline is appropriate. *Swenson*, 271 F.3d at 1196. But, remedial action under Title VII "must include some form of disciplinary measures, which must be proportionate to the seriousness of the offense." *Reynaga*, 847 F.3d at 689 (internal quotation marks, citations, and alterations omitted). The remedial action must be both prompt and effective. *Id.* at 690. And, the fact that the harassment has stopped does not obviate an employer's obligation to act. *Fuller*, 47 F.3d at 1528.

The Department's failure to take administrative disciplinary action is explained to some degree by the operation of the Department's disciplinary process. Under the Disciplinary Manual, the standard for taking disciplinary action is that: "Management must be able to show that [disciplinary] actions . . . promote the efficiency of the [S]ervice." (Doc. 27-1 at 7, § 1.6(B).) "Discipline should be imposed to correct improper employee conduct and to maintain order, morale and workplace safety throughout the workforce." (*Id.* at 8, § 1.6(C).) Accordingly, the Manual outlines the possible penalties for misconduct, based on the nature and seriousness of offense, employee's job, disciplinary record, work record, effect on future performance, consistency with other penalties, consistency with table of

Shakespeare, William. *The Merchant of Venice*, 4.1.297-303.

penalties, notoriety and impact, clarity of notice, potential for rehabilitation, mitigating circumstances, and availability of alternative sanctions. (*Id.* at 15-19, App'x A.) In the specific context of "misconduct of a sexual nature," the penalty for a first offense is written reprimand to removal; second offense, 14-day suspension to removal; and third offense, removal. (*Id.* at 24, App'x B.) Accordingly, the worst administrative penalty Lockard could receive is removal, a punishment of limited value given his retirement.

Contrary to Nelson's claim, the dispositive question is not what the Department could have done better. *Swenson*, 271 F.3d at 1197. In *Swenson*, the majority discounted the dissent's emphasis on the defects in the relevant investigation, noting that "[t]he only possible consequence of a better investigation could have been to make a stronger case for disciplining [the harasser]." *Id.* The majority further explained that "the purpose of Title VII is remedial—avoiding and preventing discrimination—rather than punitive." *Id.* Ultimately, the "[f]ailure to punish the accused harasser only matters if it casts doubt on the employer's commitment to maintaining a harassment-free workplace." *Id.* "Where, as here, the employer t[ook] prompt steps to stop the harassment, liability cannot be premised on perceived inadequacies in the investigation." *Id.* Such is the case here. The Department responded promptly as part of a criminal investigation and ultimately, Lockard was convicted and sentenced to a prison term. Punishment in

the form of criminal prosecution was "proportionate to the seriousness of the offense." *Reynaga*, 847 F.3d at 689. Just because the Department could have acted differently—as Nelson argues it should have—its actions did not "cast[] doubt on [its] commitment to maintaining a harassment-free workplace." *Swenson*, 271 F.3d at 1197. The Department exercised reasonable care to address and eliminate the harassment. Nelson's hostile work environment claim fails as a matter of law.

## II.    Retaliation

After complaining about Lockard's conduct, Nelson alleges she was subject to reprisals from her colleagues, specifically supervisors Conard and Bush, and co-workers Sharon Hooley and Wade Fredenberg. In establishing a claim for retaliation, "a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks*, 229 F.3d at 928. "Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action." *Id.* And, "[o]nce the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Id.* Considering the totality of the circumstances, *id.*, Nelson's retaliation claim fails as a matter of law.

The first element is easily resolved. Filing a complaint with the Equal

Employment Opportunity Commission is a protected activity, 42 U.S.C. § 2000e-3(a), as is making an informal complaint to a supervisor, *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). Nelson did both.

As to the second element, harassment, if sufficiently severe, may constitute adverse employment action. *Id.* at 1245. But, harassment is actionable only if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* "It must be both objectively and subjectively offensive." *Id.* "To determine whether an environment is sufficiently hostile, [courts] look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "Not every insult or harassing comment will constitute a hostile work environment." *Id.* However, "[r]epeated derogatory or humiliating statements . . . can constitute a hostile work environment." *Id.*

Here, Nelson identifies five specific instances where she believes inappropriate statements were made related to her complaint against Lockard. First, in late November 2015, Conard informed his supervisees in the Kalispell sub-office of a possible newspaper article about Lockard's criminal indictment. (Doc. 33 at ¶ 47.) Nelson was not there. Second, at some point after Conard's

36

announcement, Conard told Jodi Bush "Lockard's version of events" and while she did not share the details, Bush told Esmoil, Nelson's husband, that the two versions did not line up. (Esmoil EEO Aff., Doc. 32-3 at ¶ 11.) Nelson's knowledge is second-hand. Third, in January 2016, Nelson reported that Sharon Hooley, the administrative officer, was treating her coldly and not talking to her. (Doc. 33 at ¶ 49.) Fourth, in February 2016, Nelson reported that Hooley made a comment regarding a self-defense class that Nelson felt was an improper reference to her sexual assault. (*Id.* at ¶ 50.) Finally, in June 2016, Nelson reported that she heard third-party reports that at the American Fisheries Society Meeting in February, Wade Fredenberg discussed "Lockard's version of events" with others. (*Id.* at ¶ 51.) Again, Nelson was not there.

As argued by the Department, even if these incidents were subjectively offensive to Nelson, her allegations are insufficient to create an objectively hostile work environment as a matter of law. The alleged discriminatory conduct is relatively infrequent. Moreover, with the exception of the two instances involving Sharon Hooley, the statements and conduct were all isolated incidents at which Nelson herself was not present. *See Mannie v. Potter,* 394 F.3d 977, 983 (7th Cir. 2005) (holding the plaintiff made an insufficient showing of a hostile work environment where "[m]ost of the conduct that forms the basis of her claim consists of derogatory statements made by supervisors or co-workers out of her

37

hearing"); *Ray*, 217 F.3d at 1245 (restating that a "mere offensive utterance" is not

sufficient). In the case of both Hooley and Fredenberg, the Department responded

as soon as the incidents were reported, warning the employees.[5] While Nelson

insists that Hooley's behavior affected Nelson's work because Hooley would not

talk to her and avoided her, (Doc. 32-4 at 20, 24), "mere ostracism in the

workplace is not enough to show an adverse employment decision," *Strother v. S.*

*Cal. Permanente Grp.*, 79 F.3d 859, 869 (9th Cir. 1996).

Moreover, as Nelson herself argues, Conard, Hooley, and Fredenberg were

friends with Lockard. While the Department is required to take necessary steps to

maintain a professional workplace, it cannot "wield[] its power to interfere with its

employees' freedom to believe and associate." *Brooks*, 229 F.3d at 929 (quoting

*DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1308 (9th Cir. 2000)). So while

Nelson was offended by the fact that they believed "Lockard's version of events,"

the Department could not force them to believe differently. *Id.*

The insufficiency of the facts alleged by Nelson is all too apparent when

compared with those presented in *Ray*. There, after the plaintiff made his

complaint, "he was targeted for verbal abuse related to those complaints for a

---

[5] At oral argument, counsel for Nelson insisted that these warning should have been placed in Hooley and Fredenberg's personnel files. Counsel's argument goes beyond the record evidence in the case and counsel fails to explain how the failure to place a warning in their permanent files made the work environment hostile.

period lasting over one and half years. His supervisors regularly yelled at him during staff meetings; they called him a 'liar,' a 'troublemaker,' and a 'rabble rouser,' and told him to 'shut up.' Additionally, [the plaintiff] was subjected to a number of pranks, and was falsely accused of misconduct." *Ray*, 217 F.3d at 1245. Moreover, "[n]ot only did his supervisors make it harder for [the plaintiff] to complete his own tasks, they made [him] an object lesson about the perils of complaining about sexual harassment in the workplace." *Id.* Unlike the plaintiff in Ray, the conduct experienced by Nelson was not "reasonably likely to deter employees for engaging in protected activity." *Id.* at 1243.

Because Nelson cannot show that the conduct complained of amounts to adverse employment action, summary judgment is granted in favor of the Department as to her retaliation claim.

## III.  Motion to Strike

In support of her motion for summary judgment, Nelson includes a report prepared by a human resources expert, Lynda Brown. (*See* Doc. 32-2.) The Department subsequently moved to strike Ms. Brown as an expert on the grounds that her testimony is neither relevant nor reliable in violation of Rule 702 of the Federal Rules of Evidence. (Doc. 42.) For the reasons argued by the Department, Ms. Brown's testimony would be severely circumscribed. To the limited extent she has the experience and knowledge to opine as to the relevant standard for

administrative processes related to discrimination, her opinion does not alter the

Court's analysis as outlined above. Given the Department's success on its motion

for summary judgment, its motion to strike is denied as moot.

## CONCLUSION

Based on the foregoing, Nelson cannot recover under Title VII. Of concern

is whether that means Nelson is effectively without a remedy for what occurred

here. But that is not the case. Nelson may have been able to recover against the

Department on a tort claim, subject to the limitations of the Federal Tort Claims

Act. Moreover, Nelson's suit against Lockard will proceed, and he was also the

subject of a federal criminal prosecution. Ultimately, Title VII does not exist to

serve the punitive function Nelson seeks.

Accordingly, IT IS ORDERED that the Department's motion for summary

judgment (Doc. 20) is GRANTED.

IT IS FURTHER ORDERED that the Department's motion to strike (Doc.

41) is DENIED as MOOT.

DATED this __27th__ day of February, 2018.

Donald W. Molloy, District Judge
United States District Court

40